LATHAM & WATKINS LLP
  Robert J. Ellison (SBN 274374)
    *robert.ellison@lw.com*
10250 Constellation Boulevard, Suite 1100
Los Angeles, CA 90067
T: +1.424.653.5500 | F: +1.424.653.5501

  Andrew D. Prins (*pro hac vice forthcoming*)
    *andrew.prins@lw.com*
  Carolyn Homer (SBN 286441)
    *carolyn.homer@lw.com*
  Charles S. Dameron (*pro hac vice forthcoming*)
    *charles.dameron@lw.com*
  Soren J. Schmidt (*pro hac vice forthcoming*)
    *soren.schmidt@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
T: +1.202.637.2200 | F: +1.202.637.2201

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

|  |  |
|---|---|
| SAN FRANCISCO SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, DR. JENNIFER SCARLETT, DR. JEANNINE BERGER, KATHLEEN DILLON, JACK DRISCOLL, SHERRI FRANKLIN, DR. DAVID GORDON, DR. KATE KUZMINSKI, DR. CHRISTOPHER RODI, and DR. BRIAN VAN HORN, <br><br> Plaintiffs, <br><br> v. <br><br> JESSICA SIEFERMAN, in her official capacity as executive officer of the California Veterinary Medical Board, <br><br> Defendant. | CASE NO. <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

San Francisco Society for the Prevention of Cruelty to Animals ("SF SPCA"), Dr. Jennifer Scarlett, Dr. Jeannine Berger, Kathleen Dillon, Jack Driscoll, Sherri Franklin, Dr. David Gordon, Dr. Kate Kuzminski, Dr. Christopher Rodi, and Dr. Brian Van Horn (collectively, "Plaintiffs") bring this Complaint against Defendant Jessica Sieferman, in her official capacity as the executive officer of the California Veterinary Medical Board.  Plaintiffs allege as follows:

## **<u>INTRODUCTION</u>**

1.     The freedom of speech safeguarded by the First Amendment depends on the protection of robust channels for that speech.  It is a "fundamental principle of the First Amendment" that all Americans should have meaningful opportunities to "speak and listen" to one another.  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017).  Today, it can hardly be disputed that the "most important" channel for speech is the Internet, *id.*, which offers a "relatively unlimited, low-cost capacity for communications of all kinds," *Reno v. American Civil Liberties Union*, 521 U.S. 844, 870 (1997).  The importance of online speech has become only more pronounced over the course of the past year, as the COVID-19 pandemic has forced Americans to remain socially distant and at home, connected to their wider communities through the virtual channels of communication offered online.

2.     Plaintiffs in this case are veterinarians and pet owners in California who, like all other Americans, live in a world that has grown daily accustomed to medical appointments, court hearings, and classroom instruction conducted by Zoom and other online teleconference platforms as a matter of necessity, not convenience.  Yet when it comes to remote communications about the healthcare needs of animals, veterinarians and pet owners in California face rigid, state-imposed restrictions:  They cannot give or receive timely advice or guidance about an animal's health over the Internet or over the phone until they have first met in person.  Most strikingly, even within established relationships between veterinarians, human clients, and animal patients, a veterinarian cannot speak to a client to provide advice or guidance regarding an animal's health until the veterinarian has examined the animal in person with respect to the *particular* medical condition for which guidance is sought.  Application of these restrictions depends on the content of speech.  Veterinarians and their clients may discuss the weather, the news, or any other topic *except* the

1   health and well-being of an animal patient.  And the restrictions are not tied to any particular

2   veterinary issues, actions, or procedures—they apply across the board to all communication on the

3   subject of the animal's health.  Because many medical conditions impacting animals are short-

4   term in nature and therefore warrant only a single conversation with a veterinarian, and more long-

5   term underlying health problems are evolving in nature and therefore present new conditions on a

6   regular basis, these restrictions foreclose modern communication channels for a large swath of

7   issues arising in even longstanding established relationships.

8        3.    The restriction on speech related to new medical conditions for pre-existing clients

9   has been temporarily waived during the pandemic.  But even with that waiver, California continues

10  to forbid veterinarians from speaking with new clients about their pets' medical problems until the

11  veterinarian has physically examined the animal by hand.  And the time-limited waiver of the

12  State's most restrictive prohibitions on veterinarian-client speech is set to expire on June 30, 2021.

13       4.    California's restrictions on veterinary speech do more than abridge the First

14  Amendment rights of veterinarians and pet owners.  They also cause immense real-world harm to

15  veterinarians, their human clients, and their animal patients.  Veterinary-care providers like SF

16  SPCA and the veterinarians they employ are forced to turn away clients and patients who, due to

17  their limited mobility or remote living situations, cannot physically travel to veterinary clinics to

18  establish an in-person relationship with those providers.  Veterinarians must tell prospective clients

19  whose pets suffer from serious, even terminal, medical problems that they cannot provide guidance

20  to alleviate those animals' suffering without breaking the law.  And in many cases, California's

21  restrictions on veterinary speech impose physical-safety risks on humans and pets alike, as

22  veterinarians cannot consult with potential clients whose pets suffer from dangerous behavioral

23  problems without first approaching those animals in settings that aggravate those problems.

24  Because of these barriers, many pet owners are forced to forgo not only critical responsive

25  treatments for their animal companions, but also preventative care and check-ins.  In many cases,

26  pet owners turn to non-experts—unlicensed animal trainers or other untrained pet owners, for

27  instance—for advice and guidance.  In other cases, pet owners attempt to "Google" the problem

28

1   and carry out dubious home remedies, sometimes with disastrous results.  And too frequently,

2   animals are simply left to suffer without recourse.

3          5.     California's restrictions on veterinary speech—and the severe harms that flow

4   therefrom—are wholly unnecessary.  Other jurisdictions, including Michigan, Oklahoma, and

5   Virginia, broadly permit veterinarians to speak with clients about their pets' medical needs

6   remotely, using modern communications technology, so long as the veterinarian determines that it

7   is appropriate to do so.  *See, e.g.*, Va. Bd. of Veterinary Med., *Guidance for Telehealth in the*

8   *Practice of Veterinary Medicine*, Guidance Doc. No. 150-25 (Sept. 17, 2020),

9   http://leg5.state.va.us/pdfs/6471/77ed6006471~9e.pdf ("Virginia Board Telehealth Guidance").

10  And that pro-speech stance is the one recommended by the American Association of Veterinary

11  State Boards ("AAVSB").  In its Practice Act Model, the AAVSB requires only that "the

12  Veterinarian has sufficient knowledge of the Animal(s) to initiate at least a general or preliminary

13  diagnosis of the medical condition of the Animal(s)" in order to establish a veterinarian-client-

14  patient relationship (VCPR). AAVSB, *Veterinary Medicine and Veterinary Technology Practice*

15  *Act Model (PAM) with Commentary*, at 8, https://www.aavsb.org/board-services/member-board-

16  resources/practice-act-model ("Practice Act Model" link).  Simply put, the AAVSB entrusts these

17  decisions to speak to each veterinarian:  "A veterinarian using telemedicine must take appropriate

18  steps to establish the VCPR."  AAVSB, *AAVSB Recommended Guidelines for the Appropriate Use*

19  *of Telehealth Technologies in the Practice of Veterinary Medicine*, at 2,

20  https://www.aavsb.org/board-services/member-board-resources/practice-act-model  ("Guidelines

21  for Telehealth" link).

22         6.     The California regulators who adopted the State's restrictions on veterinary speech

23  have never offered any evidence suggesting that a different approach is required in California.  The

24  rationale put forth by those authorities is that veterinarians and their human clients must be

25  prohibited from speaking with each other because animal patients cannot speak for themselves.

26  That rationale is undercut by California's own regulations regarding the speech of medical

27  professionals who attend to humans.  Those regulations broadly permit remote communications

28  even when the patient—for instance, an infant child, or a person with mental or physical

1   impairments that inhibit communication—cannot adequately communicate their own medical

2   conditions.   And unlike, for instance, informed-consent requirements for human surgeries,

3   California's restrictions on veterinary speech are not applied only when the veterinarian plans to

4   undertake certain procedures or other actions.  This disparity between the rules governing speech

5   relating to human medicine and the rules governing speech relating to veterinary medicine is

6   entirely arbitrary, and underscores the absence of any compelling state interest supporting

7   California's restrictions on veterinary speech.

8        7.   California's restrictions on veterinary speech present a significant barrier to the

9   provision of affordable and accessible veterinary healthcare, and they do so in a fashion that raises

10   obvious constitutional problems.  Veterinary clients, including several of the Plaintiffs here, who

11   simply wish to speak with veterinary doctors remotely about the health and well-being of their

12   animal companions are prohibited from doing so in a wide array of circumstances.   And

13   veterinarians, like several of the Plaintiffs here, who simply want to speak with prospective

14   clients—so that they can offer their advice regarding the health of the clients' pets—are forbidden

15   from doing so until they meet face to face with those clients and their pets.  California's restriction

16   of informational speech unlawfully impairs Plaintiffs' First Amendment rights.   And by

17   irrationally treating veterinary speech less favorably than speech relating to human medicine,

18   California has violated Plaintiffs' constitutional right to equal protection of the laws.  Plaintiffs are

19   entitled to declaratory and injunctive relief.

20                          **JURISDICTION AND VENUE**

21        8.   Plaintiffs bring this civil-rights action for declaratory and injunctive relief under the

22   First and Fourteenth Amendments to the U.S. Constitution; the Civil Rights Act of 1871, 42 U.S.C.

23   § 1983; the Declaratory Judgment Act, 28 U.S.C. § 2201; and the principles articulated by the U.S.

24   Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908).

25        9.   This Court has subject matter jurisdiction because this action arises under the

26   Constitution of the United States.  28 U.S.C. §§ 1331, 1343.

27        10.   Venue is proper because the Defendant resides in this District.   28 U.S.C.

28   § 1391(b)(1).

# PARTIES

## *Plaintiffs*

11.     SF SPCA is an independent non-profit corporation that has been at the forefront of animal welfare in the State of California for over 150 years.  Founded in 1868, SF SPCA was the first humane society west of the Mississippi River, and played an integral role in the development and enforcement of California's early animal-cruelty laws.  In 1884, even before human ambulances first appeared in San Francisco, SF SPCA designed and built an ambulance for the carriage of disabled horses.  And in 1890, SF SPCA built an "Animals Home" at the corner of 16th and Alabama Streets, where SF SPCA's Mission Adoption Center and veterinary hospital still stands to this day.  SF SPCA has directly sponsored the provision of medical services to animals in California for over a century.  Today, SF SPCA operates two animal hospitals that employ over 30 veterinary doctors and dozens more veterinary technicians and veterinary assistants.  In a typical year, SF SPCA hospitals perform more than 50,000 patient exams on animals.

12.     One of SF SPCA's core organizational missions is to improve the access, quality, and affordability of veterinary care.  Crucial to that mission is making preventative advice and other veterinary counseling available remotely.  Veterinarians at SF SPCA communicate with current clients using telemedicine for a range of animal issues, including medical management for animals with ongoing illnesses and chronic pain conditions, ear and skin problems, mild diarrhea and coughing, vaccination and health certificates, and quality of life discussions.  Because of California's restrictions on veterinary telemedicine, however, SF SPCA is limited in the nature of the conversations its veterinarians can have, the clients with whom it can speak, and the patients that it can serve.

13.     Dr. Jennifer Scarlett is the president of SF SPCA and is a licensed veterinarian with over twenty years' experience in the medical treatment of animals.  In her capacity as president of SF SPCA and Chief Medical Officer for SF SPCA's two veterinary hospitals, Dr. Scarlett oversees the organization's policies and procedures, including SF SPCA's telemedicine initiatives.  Dr. Scarlett would like her organization to be allowed to speak with clients using modern telecommunications so that SF SPCA can deliver healthcare to all animals, especially those for

whom in-person clinic visits are infeasible due to a variety of causes, such as personal disabilities, financial limitations, lack of proximity to veterinary offices and specialists, or limited transportation options.  The combined veterinary programs overseen by Dr. Scarlett serve tens of thousands of animals each year, and Dr. Scarlett estimates that they could serve thousands more through telemedicine.  But California's restrictions prevent Dr. Scarlett's organization and the many veterinarians she oversees from speaking with clients who need their critical and often lifesaving counsel for animals around the State.

14.    Dr. Jeannine Berger is a board-certified veterinary behaviorist who directs the clinical behavior programs at SF SPCA.  Dr. Berger would like to use phone calls and online platforms like Zoom on a case-by-case basis to hear from and advise potential clients whose animal companions suffer from behavioral problems.  In certain cases, diagnosing and treating behavioral conditions virtually is more effective than hands-on treatment because the veterinarian can observe and address the issues as they occur in the animal's normal environment, rather than in the artificial, anxiety-producing conditions of an office or hospital.  But due to California's categorical prohibition on telemedicine without a preexisting veterinary relationship, Dr. Berger can neither observe many potential clients' animals nor provide those clients with necessary advice.

15.    Kathleen Dillon is a lifelong pet owner and volunteer for "Pen Pals," a Marin Humane program that brings dogs into the San Quentin prison to visit inmates.  Ms. Dillon's current dog, Moby Mike, was enrolled in that program before she adopted him.  Ms. Dillon's dog suffers from several behavioral and psychological problems.  But for California's restrictions, Ms. Dillon would seek advice concerning her dog's health issues through Internet- and phone-based communication, including potentially from Dr. Berger.

16.    Jack Driscoll resides in San Francisco and owns an adopted cat, Ichirose.  Mr. Driscoll's cat may have periodic medical issues, and could benefit from periodic wellness exams. Mr. Driscoll has foregone such exams, but would like to obtain them through virtual consultations, if possible.  Additionally, if his cat were to need any treatment for any medical problems that may arise, he would want to speak to a veterinarian via a phone or video call without first taking his cat to an in-person appointment.

17. Sherri Franklin is a resident of San Francisco and the founder of Muttville, an animal-rescue and shelter organization focusing on elderly dogs. To date, Muttville has rescued and found homes for nearly nine thousand dogs. Today, Ms. Franklin personally has five senior dogs with medical needs that would be well suited to virtual diagnosis and treatment. But for California's restrictions, Ms. Franklin would, as appropriate, speak with veterinarians using modern telecommunications technology to seek care for her personal dogs and those in the care of her organization.

18. Dr. David Gordon is a veterinarian at Mission Pet Hospital in San Francisco, where he has practiced general veterinary medicine for 21 years. He is the treating veterinarian for many dogs rescued by Muttville, and would like to speak to new clients using phone, video conferencing, or other remote technology services where possible, but is forbidden from doing so by California's restrictions on veterinary speech.

19. Dr. Kate Kuzminski is currently the Medical Director for Guide Dogs for the Blind in San Rafael, California, and has been practicing veterinary medicine for over twenty years. Dr. Kuzminski has approximately 3,000 blind and visually impaired clients, all of whom have at least one animal. Dr. Kuzminski also oversees several veterinarians who work with Guide Dogs clients. For Dr. Kuzminski's clients, visiting a veterinarian's office can be extremely challenging. And many of her clients live in "veterinary deserts" where a trip to a veterinarian can take hours. Dr. Kuzminski, and the veterinarians under her supervision, would like to be able to speak with these clients and assist them—where appropriate—by phone or Zoom, but the current regulations prohibit this speech. If the regulations were changed, these veterinarians and their clients would greatly benefit from these platforms for communication.

20. Dr. Christopher Rodi is a Marin County veterinarian who has been practicing veterinary medicine for nearly three decades. He is also the Medical Director of the Pet Emergency and Specialty Center of Marin ("PESCM"), a full service veterinary hospital and emergency clinic. PESCM provides care 24 hours a day, 365 days a year. In addition to providing an open door for emergency patients, PESCM has specialists in internal medicine, surgery, oncology, ophthalmology, and veterinary nutrition. PESCM's veterinarians could use Zoom to speak with

1    countless additional pet owners to assist with the care of their pets throughout the State who are

2    unable to obtain these kinds of specialty services, but the current restrictions on telemedicine

3    prohibit them from engaging in that speech.  Dr. Rodi would like the veterinarians he oversees to

4    be able to speak to such owners, but California's restrictions prevent them from speaking with

5    clients who need their critical and often lifesaving counsel.

6         21.    Dr. Brian Van Horn is a San Francisco veterinarian in private practice, and is the

7    founder of Bay Area Veterinary Housecall Associates and Golden Gate Veterinary Home Hospice

8    and Euthanasia.  He is also a member of the San Francisco Animal Control & Welfare

9    Commission, an advisory board responsible for making recommendations and reports to the San

10   Francisco Board of Supervisors on legislation and policies respecting animal welfare and public

11   safety in connection with the treatment of animals.  For the past 11 years, Dr. Van Horn has

12   developed a specialty in animal hospice care, focusing on the quality of life for elderly pets.  Due

13   to their old age and accompanying medical conditions, it is difficult and often very painful for

14   elderly pets to travel.  But for California's restrictions on veterinary speech, Dr. Van Horn would

15   use phone calls and Internet services to safely speak with remote clients and provide critical advice

16   for underserved animal patients who may otherwise experience unnecessary suffering that could

17   easily be alleviated through virtual consultations.

18        *Defendant*

19        22.    Defendant Jessica Sieferman is the executive officer of the California Veterinary

20   Medical Board ("Board"), a governmental agency whose stated mission is the protection of

21   California consumers and their animals through the regulation of veterinary medicine.  The

22   principal office of the Veterinary Medical Board is located at 1747 North Market Boulevard, Suite

23   230, Sacramento, CA 95834.  As executive officer of the Board, Ms. Sieferman "exercise[s] the

24   powers and perform[s] the duties delegated by the board and vested in" the Board by law.  Cal.

25   Bus. & Prof. Code § 4804.5.  Ms. Sieferman is responsible for investigating and prosecuting

26   violations of the Board's regulations, and the Board has delegated to Ms. Sieferman its "power

27   and discretion to receive and file accusations" against veterinarians, Cal. Code Regs. tit. 16,

28   § 2003(a), as well as the power to "issue . . . citation[s]" and assess civil penalties for violations of

1    the Board's regulations; *id.* § 2043.   In her official capacity, Ms. Sieferman serves as the

2    complainant in professional disciplinary proceedings against California veterinarians.  She is sued

3    in her official capacity.

4                                           **FACTUAL ALLEGATIONS**

5            23.    Veterinarians and their clients—like all other Americans protected by the First

6    Amendment—have a right to speak to each other, including through technological means that

7    permit those communications to occur in a remote, non-face-to-face setting.  The conveyance of

8    veterinary advice and guidance through remote means—often called veterinary telehealth or

9    telemedicine—can be as effective or more effective than in-person care in many cases, and far

10   more beneficial to animals and owners, such as when animals have behavioral problems, chronic

11   pain or illness conditions, difficulties being transported, or live hundreds of miles from specialty

12   veterinarians who might be able to provide valuable care through telemedicine.

13           24.    Despite the many potential advantages of veterinary telemedicine, and contrary to

14   the recommendation of the American Association of Veterinary State Boards, the Board has

15   categorically prohibited veterinarians from using modern communications technologies to provide

16   medical advice to new patients unless and until the veterinarian has personally performed a hands-

17   on examination of the animal.  And no matter how long a veterinarian has known a client or worked

18   with the client's pet as a patient, California's restrictions bar the veterinarian from speaking to the

19   client about *any new medical conditions* that arise with that patient until the veterinarian has

20   performed another hands-on physical examination with respect to that new condition (for which a

21   hands-on physical examination may not even be relevant or necessary).[1]  These restrictions prevent

22   Plaintiff pet owners from speaking with veterinarians to obtain timely advice for their pets.  And

23   they prevent Plaintiff Veterinarians—and the veterinarians they supervise—from communicating

24   their advice to potential clients until they have conducted a hands-on exam, which is frequently

25   infeasible, unnecessary, and in many situations contrary to best practices and the health of the

26   animals involved.  California's veterinary-speech restrictions unconstitutionally burden Plaintiffs'

27   ───────────────

28   [1] As noted above, this "medical condition" restriction has been temporarily waived during the
     pandemic.  That waiver is set to expire imminently.  *See infra* ¶ 55.

free speech rights, and they unconstitutionally discriminate between Plaintiffs and other similarly situated medical providers and patients.

**California Restricts Veterinary Speech Through Remote Communication**

25.     "Telemedicine" is an area of growing importance in veterinary medicine.  Although definitions of "telemedicine" vary, California defines veterinary "telemedicine" as "the mode of delivering animal health care services via communication technologies to facilitate consultation, treatment, and care management of the patient." Cal. Code Regs. tit. 16, § 2032.1(f).  Thus, under California law, veterinary telemedicine encompasses pure speech, including a veterinarian's remote "consultation" with a client (or another veterinarian) regarding the healthcare needs of an animal patient. *Id.*

26.     Consistent with California's general rule that "[n]o person may practice veterinary medicine in [California] except within the context of a veterinarian-client-patient relationship," *id.* § 2032.1(e), California permits "telemedicine" to occur only within an "existing veterinarian-client-patient relationship," or VCPR, *id.* § 2032.1(f).  Establishment of a VCPR requires, among other things, that the veterinarian must have "sufficient knowledge of the animal(s) to initiate at least a general or preliminary diagnosis of the medical condition of the animal(s)." *Id.* § 2032.1(b)(2).  This requires the veterinarian to be "personally acquainted with the care of the animal(s) by virtue of an examination of the animal or by medically appropriate and timely visits to the premises where the animals are kept." *Id.*

27.     For many years, the question whether a VCPR could be formed through telephonic or electronic means was unresolved.  In 2007, for instance, an administrative law judge for the Board, in an opinion that was adopted by the Board, noted that it was an open question whether a veterinarian could obtain "sufficient knowledge" of an animal to form a VCPR through "remote video, telemetry, [or] other technology." *Dodd v. Cal. Veterinary Med. Bd.*, No. A124052, 2009 WL 4643931, at *6 (Cal. Ct. App. Dec. 8, 2009).  But in 2019, as discussed further below, the Board promulgated new regulatory language specifying that "a veterinarian-client-patient relationship cannot be established solely by telephonic or electronic means." Cal. Code Regs. tit. 16, § 2032.1(e).

28.     The upshot of California's regime is that veterinarians and pet owners may not speak to each other using routine tools of modern communication—computer or mobile-phone videoconferencing, encrypted chat, text message, email, or phone—for the purpose of consultation regarding the health of an animal unless those communications fall within an existing VCPR.  They may not form a VCPR through such channels of communication, but must instead meet in person so that the veterinarian can undertake a hands-on physical examination of the animal.  And because a VCPR requires familiarity with the particular "*medical condition* of the animal," *id.* § 2032.1(b)(2) (emphasis added), the client and the veterinarian may not necessarily rely on the existence of an established relationship to speak with each other regarding the health of the animal in a myriad of situations that may arise on a routine basis.  Rather, the Board's view is that a veterinarian and client must establish a new VCPR *each and every time* the animal patient develops a new medical condition.

29.     These restrictions place extraordinary burdens on the free-speech rights of veterinarians and pet owners alike.  Plaintiff Sherri Franklin's situation exemplifies the burdens on client speech, as well as the restrictions' significant impacts on animal health.  Ms. Franklin's five elderly dogs suffer from numerous long-term medical conditions, including diabetes, Cushing's syndrome, and lymphoma.  Ms. Franklin cannot consult with any veterinarian about any of her dogs' conditions unless that veterinarian first examines the dogs in person.  But the dogs' age and fragility make in-person appointments difficult and painful.  In addition, the kinds of chronic diseases from which her dogs suffer often cause symptoms that may lead to *new* medical conditions necessitating *new* VCPRs.  Rather than forcing her dogs into frequent and painful visits to animal clinics, Ms. Franklin would prefer to speak with veterinarians about her dogs' conditions through means of remote communication, such as Zoom or Skype, as they arise.  California's restrictions foreclose that possibility.

30.     Of course, California's restrictions restrain veterinarians from exercising their free-speech rights too.  In response to inquiries from pet owners seeking telemedicine services, veterinarians like those managed by SF SPCA and Dr. Scarlett, the veterinarians managed by Dr. Rodi, and Dr. Kuzminski and the veterinarians she oversees, along with Drs. Berger, Gordon, and

Van Horn (collectively, the "Plaintiff Veterinarians"), have had to inform those prospective clients that they may not provide veterinary advice regarding the health of their pets without an initial in-person examination, even when such examination would be unnecessary, undesirable, or even harmful to the animal.  Many veterinarians could easily provide more effective assistance to pet owners and their animal companions through simple consultation—that is, speech—delivered via telephone or Zoom.  Some of the Plaintiff Veterinarians, for instance, frequently work with patients that require mobility assistance.  In such instances, a determination of the proper course of care often involves a discussion with the patient's owner, in addition to observation of the patient's gait and posture.  In most cases, those observations and discussions may readily be conveyed through telemedicine, because photos and videos can provide adequate evidence of the patient's condition and needs.  But even when speaking remotely about these issues would be in the best interests of the client and patient, California's restrictions do not permit such speech.  Instead, veterinarians must categorically insist on a hands-on examination before engaging in any substantive communication with the client.  This experience—that is, the experience of being prevented from speaking until they have undertaken an examination that is neither necessary nor useful—is not unusual.  Indeed, as discussed below, veterinary telemedicine frequently offers significant advantages over in-person veterinary appointments.  Yet California's restrictions on veterinary speech make it impossible to secure those advantages.

**Veterinary Telemedicine Is An Effective Alternative To In-Person Care In Many Cases, And California's Restrictions Harm Veterinarians, Pets, And Their Owners**

31.     Although telemedicine has recently grown in prominence and popularity due to the proliferation of affordable and widely used videoconferencing platforms, the concept of veterinary telemedicine is nothing new.  *See* Lori Massin Teller & Heather K. Moberly, *Veterinary Telemedicine:  A Literature Review*, Veterinary Evidence, at 2 (Oct. 30, 2020), https://www.veterinaryevidence.org/index.php/ve/article/download/349/562?inline=1 (discussing the early transmission of electrocardiograms by fax, "allowing primary care providers to benefit from advice from experts thousands of miles away").  For several years, commentators have described the potential advantages of veterinary telemedicine as compared to in-person veterinary

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

care in terms of efficiency ("improved access to care, client convenience, . . . [and] reducing the workload on front office staff," *id.* at 12) as well as in more qualitative terms ("enhanced veterinary-to-client bond," *id.*, and "the ability of virtual care to reduce stress and anxiety in animal patients," *id.* at 14).

32. Veterinary telemedicine offers especially compelling advantages over in-person care in certain situations and veterinary specialties. The treatment of behavioral conditions—a common but frequently overlooked element of veterinary care, and a recognized specialty within the profession—often involves such situations. Diagnosing behavioral conditions often does not require a physical exam, and instead relies primarily on a description, record, or images of the behavior and its surrounding circumstances. Treatment of those conditions typically involves reducing behavioral triggers, managing behaviors when they appear, and teaching alternative behaviors. These steps can be carried out effectively through remote appointments. In fact, in-person visits are often less effective because many of the cues and environmental factors that contribute to the behavioral conditions are absent in hospital or office settings, making in-person visits an artificial, unhelpful, and potentially misleading setting for addressing animal behavior.

33. Relatedly, some animals have severe anxiety or aggression problems that make in-person visitation difficult and dangerous without the use of sedatives, painkillers, or other calming medication for the animal. Under California's existing regulatory regime, veterinarians who want to provide medical advice and guidance for such new patients face a Catch-22. They cannot safely observe the animal in person without dispensing medication. But they cannot legally prescribe even mild, calming medicine until after they have observed the animal in person in order to establish a VCPR. Veterinarians like Plaintiff Dr. Van Horn report that in order to be both safe and legally compliant, they must execute a gymnastic series of steps before they even speak with their client about the best way to help the patient: (1) travel to the client's home, (2) examine the patient "through the fence" or other protective barriers to formalize a VCPR and maintain a safe environment for all involved, (3) prescribe the necessary calming medicine, (4) schedule another appointment, (5) actually perform a full physical exam, and (6) recommend the appropriate treatment. The extra steps in that process not only present additional costs for veterinarians and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

their clients, but they also frequently delay critical care for animal patients. Absent the telemedicine restrictions, the veterinarian could conduct an initial consultation remotely to prescribe the necessary (and harmless) calming medication and then, if needed, conduct a hands-on examination in a single appointment thereafter—delivering care with far greater speed and efficiency. (And in many cases, the hands-on examination might not even be needed.) And the veterinarian could speak freely with the client throughout the process, exchanging information and ideas to shape the best course of treatment.

34. Another veterinary practice in which telemedicine offers distinct advantages is in the area of palliative and comfort-based care for pets and their owners, when the pets are experiencing an advanced, life-limiting illness. This type of care, also called hospice care, provides compassionate assistance for animals experiencing either chronic illnesses with ongoing problems, or for those in the last phases of incurable disease. These animals may experience a series of new "medical conditions," and veterinarians who specialize in this area provide supportive care so that the animals (and their owners) may live as fully and comfortably as possible. This is a specialized practice area that is generally unavailable in California outside of a few urban centers. This means that most pets and their owners statewide simply cannot obtain this vital care for their suffering animals given the distance to California's cities. Because of ambulatory difficulties and other ailments common to animals needing this kind of care, both transportation and hands-on exams can be painful, costly, counterproductive, and time-consuming. Many such animals develop conditions—including those relating to physical therapy, neurological deterioration or damage, hot spots and skin problems, mild gastrointestinal issues, ear infections, and chronic pain—that could be easily diagnosed and treated virtually. Telemedicine, by allowing veterinarians and clients to communicate about these conditions remotely, would allow immediate delivery of treatment and potential relief of symptoms, and alleviate the extra burdens of transporting these suffering patients, who tend to be less ambulatory and more prone to injury or pain. But California's restrictive VCPR requirements categorically foreclose that communication about both new patients and new conditions, leaving animals to suffer during the additional time it takes to arrange a hands-on exam, if one can be arranged at all.

35.     California's restrictions cause unnecessary harm to veterinarians and their clients and unnecessary suffering in animals.  Plaintiff Kathleen Dillon's situation demonstrates the problem.  Her dog, Moby Mike, has multiple behavioral problems, including severe anxiety, for which Ms. Dillon would like to obtain behavioral veterinary care through virtual consultations.  But her dog is terrified of the social situations that an office visit necessarily involves.  California's restrictions do not allow her to establish a VCPR with a veterinary behaviorist like Dr. Berger virtually, but an in-person visit poses risks to her dog and perhaps other people.  California's restrictions needlessly place Ms. Dillon and her dog in a no-win situation.  Likewise, the restrictions on veterinary speech prevent Plaintiff Jack Driscoll from obtaining important preventative care for his cat, Ichirose.  Mr. Driscoll would like to speak with a veterinarian by phone or Zoom, if he could.  But because that option is not available under California's restrictions, he has not obtained general wellness advice and other preventative care for Ichirose.  The Plaintiffs' inability to establish a VCPR with their preferred care providers through initial remote consultations has kept them from seeking critical responsive and preventative care for their pets' physical and psychological conditions.

36.     Dr. Kuzminski previously worked as a veterinarian for Rural Assistance Veterinary Services ("RAVS"), a non-profit veterinary outreach program that brings free veterinary services to underserved rural communities where poverty and geographic isolation make regular veterinary care inaccessible.  But for RAVS, the people and pets in those areas would have no veterinary care, in large part because of the prohibition on telemedicine.  If California veterinarians could speak to clients remotely without conducting a hands-on examination first, thousands of individuals and their pets, who now receive no veterinary care at all, could easily speak with veterinarians and receive advice on how to deal with problems that do not require a visit to the clinic.

37.     California's restrictions also harm veterinarians.  Any provider of veterinary medicine who speaks with a client in violation of California's restrictions is, at a minimum, subject to a civil penalty of between $250 and $3,000 per violation.  Cal. Code Regs. tit. 16, § 2043.  The veterinarians managed by SF SPCA and Dr. Scarlett, the veterinarians managed by Dr. Rodi, and

Dr. Kuzminski and the veterinarians she oversees, along with Drs. Berger, Gordon, and Van Horn, have not offered initial virtual consultations because of these penalties. Accordingly, they have lost many potential clients and patients and been denied the opportunity to share veterinary advice.

38. For example, due to California's restrictions, Dr. Berger—a board-certified behavioral specialist who would in many cases prefer to interact with clients and patients remotely—has had to repeatedly turn away potential clients seeking advice for their pets through modern telecommunications services. Many of those potential clients have subsequently resorted to non-veterinarians, including unlicensed animal trainers and pet consultants who operate without any medical training or oversight. Since other animal service providers are not covered by California's restrictions, these non-veterinarians can offer virtual services to address the same behavioral issues in which Dr. Berger specializes, but without the knowledge and experience of highly trained professionals, who have special expertise that enables them to understand when in-person or virtual care would be most appropriate. The result, in addition to economic losses for Dr. Berger and veterinarians like her, can be substandard care for clients and patients.

**California's Justifications For Its Restrictions On Veterinary Speech Do Not Add Up**

39. Since at least July 2011, the Board has considered the role of remote communications in veterinary medicine. In the course of that process, veterinarians have submitted numerous comments explaining that many aggressive pets cannot tolerate in-person visits to a veterinary facility, and that due to the advancement of technology, a remote video examination allows the veterinarian to provide services in a relaxed home environment and provide the same services as a hands-on exam, without the potential of the pet masking symptoms by being stressed in a foreign environment. In addition, veterinarians submitted comments encouraging telemedicine services because they would enable clients in remote areas to obtain care from a veterinarian.

40. The Board is also aware that the American Association of Veterinary State Boards ("AAVSB") has concluded that in some situations, telemedicine may be an appropriate or even preferable way to form a VCPR and provide subsequent care. *See* Cal. Dep't of Consumer Affairs, Veterinary Med. Bd., *Second Amended Meeting Notice and Agenda*, at 71-78 (Feb. 21-22, 2018),

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

COMPLAINT

https://www.vmb.ca.gov/meetings/materials/20180221_vmb.pdf ("Veterinary Medical Board Second Amended Meeting Notice").  AAVSB is a non-profit association of regulatory boards from sixty-two jurisdictions—including all of the United States—that periodically develops and promulgates guidelines and model rules for the veterinary profession.  In 2018, AAVSB guidelines supported the creation of a VCPR through means other than physical examination.  *See* AAVSB, *AAVSB Recommended Guidelines for the Appropriate Use of Telehealth Technologies in the Practice of Veterinary Medicine*, at 3 & n.3 (Sept. 2018), https://www.aavsb.org/Download?url=s/zvw7kz187dic8zu/Guidelines%20for%20Telehealth.pdf (detailing that support).  AAVSB acknowledged that electronic modalities could be the basis for the establishment of a VCPR and the subsequent provision of care via telemedicine.

41.     Other jurisdictions have followed that recommendation.  In Virginia, for instance, the state veterinary board has adopted the AAVSB's guidelines regarding examinations performed through "instrumentation . . . through which images and medical records may be transmitted electronically."  Virginia Board Telehealth Guidance, *supra* at 2.  In Oklahoma, a VCPR may be established by "recently seeing or being personally acquainted with the keeping and care of the animal to the extent necessary to properly make appropriate medical decisions."  Okla. Veterinary Bd., *Veterinarian-Client-Patient-Relationship FAQs*, https://www.okvetboard.com/client-information (last visited April 27, 2021).  Oklahoma's guidelines acknowledge that "some situations and patient presentations are appropriate for the utilization of telehealth technologies as a component of, or in lieu of, hands-on medical care."  Okla. Veterinary Bd., *Board's Telemedicine/Telehealth Position Statement*, https://www.okvetboard.com/veterinarian-faq (last visited April 27, 2021).  And in April 2021, Michigan adopted similar regulations.  *See* Mich. Admin. Code r. 338.4901a.  These guidelines permit veterinarians to speak with their clients in the manner of their choosing so long as they have had the chance to assess the animal patient's needs in a medically appropriate manner.  And the AAVSB model discussed above allows a veterinarian to establish a VCPR remotely, and leaves the decision on how to do that to each jurisdiction.

42.     As the Board knows, empirical results have validated the decision to allow veterinarians and clients greater leeway to speak to one another remotely.  In 2018, the College of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

1   Veterinarians of Ontario ("CVO"), the Canadian licensing body similar to California's Board,

2   revised its standards to allow veterinarians to establish a VCPR by telemedicine.  Ontario is

3   Canada's most populous province, with roughly 15 million people and 5300 regulated

4   veterinarians.  As of January 2021—three years after Ontario's regulatory revision—the CVO had

5   received "no complaints related to the practice of telemedicine."  *See* Cal. Dep't of Consumer

6   Affairs, Veterinary Med. Bd., Multidisciplinary Advisory Committee Meeting, at 1:08:15,

7   YOUTUBE (Jan. 27, 2021), https://www.youtube.com/watch?v=vp4Y6ApYV3I.  That evidence

8   was presented directly to the Board's Multidisciplinary Committee in January 2021 by Jan

9   Robinson, Registrar and CEO of the CVO.  *Id.*  Moreover, the "Ontario pet owners who have

10  participated in a telemedicine consultation report a 75% resolution rate with pet-absent

11  telemedicine consults.  Only 25% reported that they had to bring their pet in to see the

12  veterinarian."  Ontario Veterinary Med. Ass'n, *The Current State of Telemedicine in Ontario*, at 3

13  (Nov. 5, 2020).

14      43.     Notwithstanding veterinary telemedicine's success in other jurisdictions, the Board

15  has concluded that in California, a VCPR must be established in-person before veterinarians may

16  speak with clients about *any* of their animals' medical needs.  In doing so, the Board has explicitly

17  acknowledged the risks to animals and humans of certain in-person visits, and the regressive

18  impact of denying telemedicine to clients and patients in remote areas.  But the Board's response

19  to those concerns, ironically, is that "[r]egulations are not typically written solely for one

20  population."  *See* Veterinary Medical Board Second Amended Meeting Notice, *supra* at 73.

21      44.     The Board has repeatedly justified its restrictions on veterinary speech on the

22  grounds that veterinary diagnoses and evaluations require veterinarians to "feel the animal, listen

23  to heart and lungs, check the eyes and ears, etc.," Cal. Dep't of Consumer Affairs, Veterinary Med.

24  Bd.,        *Final       Statement       of       Reasons,       Telemedicine*,

25  https://www.vmb.ca.gov/laws_regs/telemed_fsor.pdf ("Veterinary Medical Board Final Statement

26  of Reasons"), even though such actions are irrelevant for many conditions.

27      45.     The Board's other justification for its veterinary-speech restrictions is that animal

28  patients cannot speak for themselves.  *See* Cal. Dep't of Consumer Affairs, Veterinary Med. Bd.,

1   Meeting        Minutes,        at        2        (July        26-27,        2017),

2   https://www.vmb.ca.gov/meetings/minutes/20170726_27_vmb.pdf.        "Communication    is

3   expressed solely by the animal owner, who likely has no veterinary training to properly diagnose

4   or express a sickness or symptom of the animal."  Veterinary Medical Board Final Statement of

5   Reasons, *supra* at 3.  But in light of California's treatment of telemedicine for humans, that

6   rationale  makes  little  sense.   As  described  below,  California  broadly  permits  the  use  of

7   telemedicine  with  respect  to  human  patients—even  where  those  patients  cannot  speak  for

8   themselves, and where those speaking for them have no medical "training to properly diagnose or

9   express a sickness or symptom."

10                **California Widely Permits The Use Of Telemedicine For Human Beings**

11        46.    Even before the pandemic, California permitted the use of remote appointments to

12   establish doctor-patient relationships for humans of all ages, including for young children, and

13   those  with  mental  and  physical  impairments  who  cannot  communicate  their  own  medical

14   conditions  or  health  concerns.   Those  individuals  rely  on  their  caregivers—often  friends  or

15   relatives with no medical training—to provide information necessary for the delivery of medical

16   care via telemedicine.

17        47.    Specifically,   pursuant   to   California   Business   and   Professions   Code

18   section 2290.5(b), California does not require a physical, in-person examination before doctors

19   can speak to human patients about their medical conditions.  Rather, the delivery of telehealth

20   services depends upon the patient's consent (or that of the patient's parent or guardian).

21        48.    Indeed, California goes so far as to bar health insurers from making face-to-face

22   treatment a precondition for reimbursement:  "A health care service plan shall not require that in-

23   person contact occur between a health care provider and a patient before payment is made for the

24   covered  services  appropriately  provided  through  telehealth . . . ."   Cal. Health & Safety Code

25   § 1374.13(c); *see also* Cal. Welf. & Inst. Code § 14132.72(c) (similar under Medi-Cal).  The law

26   makes no exceptions for providers serving individuals who cannot communicate their conditions

27   or symptoms.

28

49.     California also specifically permits pediatric medical care to be conducted via virtual communications.  Indeed, California regulations governing Advanced Pediatric Receiving Centers—emergency facilities for pediatric care—*require* such facilities to provide certain "qualified specialists," including pediatric gastroenterologists, neurologists, and surgeons, to be "available twenty-four [] hours a day, 7 days a week, for consultation *which may be met through . . . telehealth*."  Cal. Code Regs. tit. 22, § 100450.221(b)(7) (emphasis added).

50.     Further, all Pediatric Receiving Centers must "[e]stablish a process for obtaining and providing consultation via phone, telehealth, or onsite for emergency care and stabilization, transfer, and transport."  Cal. Code Regs. tit. 22, § 100450.218(a)(2).  This permissive stance is inconsistent with the Veterinary Medical Board's justification for restricting telehealth for animals. Young children and other patients with guardians who are unable to communicate are often, like pets, "unable to communicate their sickness or symptoms.  Communication is expressed solely by the [guardian], who likely has no [medical] training to properly diagnose or express a sickness or symptom."  Cal. Dep't of Consumer Affairs, Veterinary Med. Bd., *Initial Statement of Reasons, Telemedicine*, at 4, https://www.vmb.ca.gov/laws_regs/telemed_isor.pdf.    Nonetheless, telemedicine offerings are widely permitted—and in many instances required—in California, for young and old alike who cannot communicate, and where communication is usually "expressed solely" by a guardian who lacks medical training.

51.     The Board has thus arbitrarily deprived veterinarians of the opportunity to speak with clients using modern telemedicine communication methods, like Zoom, that are available to doctors who care for human beings, and which have become increasingly valuable and essential tools to the delivery of safe and comprehensive healthcare.

**Modifications To Telemedicine Restrictions During The COVID-19 Pandemic**

52.     In March 2020, Governor Gavin Newsom responded to the World Health Organization's declaration of COVID-19 as a pandemic, and the rapid rise of COVID-19 cases within the State, by enacting a state of emergency.

53.     Pursuant to an executive order from Governor Newsom in response to the COVID-19 pandemic, medical healthcare providers need not obtain the verbal or written consent of their

1  human patients before speaking with them virtually.  Cal. Exec. Order No. N-43-20 (Apr. 3, 2020),

2  https://www.gov.ca.gov/wp-content/uploads/2020/04/4.3.20-EO-N-43-20-text.pdf.

3  54.  Governor Newsom separately issued Executive Order N-39-20, permitting the

4  Director of the California Department of Consumer Affairs to waive any statutory or regulatory

5  professional licensing requirements arising under the Business and Professions Code for the

6  duration of the COVID-19 state of emergency.  Cal. Exec. Order No. N-39-20 (Mar. 30, 2020),

7  https://www.gov.ca.gov/wp-content/uploads/2020/03/3.30.20-EO-N-39-20.pdf.

8  55.  The Department of Consumer Affairs has exercised this authority and issued an

9  order that "enable[s] the use of telemedicine to diagnose and treat animals" by waiving California's

10  VCPR requirements—but only in connection with a veterinarian's *current* patients, and "to the

11  extent they require veterinarians to perform an in-person examination of the animal in order to

12  diagnose a *new or different medical condition*, and communicate with the client a course of

13  treatment appropriate to the circumstances."  Cal. Dep't of Consumer Affairs, *Order Waiving*

14  *Restrictions on Telemedicine and Extending Time to Refill Prescriptions* (June 4, 2020),

15  https://www.dca.ca.gov/licensees/dca_20_21.pdf (emphasis added).  As the Board explained in a

16  guidance document elaborating on the order, the order temporarily permits veterinarians who have

17  previously established an in-person VCPR with a given patient with respect to one medical

18  condition to use remote communications technology to address *new* or *different* medical conditions

19  "not previously diagnosed," so long as the condition "can be properly diagnosed and treated

20  through the use of telemedicine." Jessica Sieferman, Exec. Officer, Veterinary Med. Bd., *Updated*

21  *Guidance on Department of Consumer Affairs' Waivers Regarding Veterinarian-Client-Patient*

22  *Relationship*, at 3 (Sept. 18, 2020), https://www.dca.ca.gov/licensees/dca_20_21_guidance.pdf.

23  Still, the waiver does not permit veterinarians to establish VCPRs with new clients and patients

24  through electronic means.  And what benefit veterinarians, clients, and patients will obtain from

25  this waiver is entirely temporary:  although the Department of Consumer Affairs recently extended

26  the waiver, it is scheduled to terminate on June 30, 2021.  *See* Cal. Dep't of Consumer Affairs,

27  *Order Further Extending June 4, 2020 Order Waiving Restrictions on Telemedicine and Extending*

28  *Time to Refill Prescriptions* (Apr. 30, 2021), https://www.dca.ca.gov/licensees/dca_21_151.pdf.

1  Because the waiver rests on the existence of the current state of emergency, there is no reason to

2  believe that the waiver will be extended once the pandemic has run its course, and the Board has

3  indicated its intent to revert to its more restrictive regulations, despite any lessons learned while

4  the waiver has been in effect.

5        56.    In attempting to follow public-health guidelines, Plaintiff Veterinarians would

6  prefer to be able to initiate new VCPRs with prospective clients and patients who have not

7  previously received advice or guidance from those veterinarians through modern means, such as

8  by Zoom or telephone.  Yet even under the modified regulatory regime reflected in the Director's

9  temporary COVID-19 waiver, Plaintiff Veterinarians cannot initiate new VCPRs with new clients

10  through remote communications.

11        57.    Plaintiff Veterinarians' inability to speak with and advise new patients remotely—

12  even as the conditions imposed by the pandemic have made in-person assessments all but

13  impossible in many cases—has imposed a severe burden on their ability to fulfill their mission of

14  attending to the welfare of animals in the San Francisco Bay Area and beyond.  And Plaintiff

15  Veterinarians are concerned that, once the current waiver expires, their ability to serve their

16  existing veterinary clients and patients will continue to be impaired by California's restrictions on

17  veterinary speech.

18  **FIRST CLAIM FOR RELIEF**

19  **First and Fourteenth Amendments – Free Speech**

20        58.    The foregoing paragraphs are incorporated as though set forth fully herein.

21        59.    The First Amendment, which is made applicable to the State of California through

22  the Due Process Clause of the Fourteenth Amendment, provides: "Congress shall make no law . . .

23  abridging the freedom of speech."  U.S. Const. amend. I.

24        60.    California prohibits any "consultation . . . of [a veterinary] patient" from being

25  "deliver[ed] . . . via communication technologies" unless such consultation is "conducted within

26  an existing veterinarian-client-patient relationship."  Cal. Code Regs. tit. 16, § 2032.1(f).  And it

27  prohibits a "veterinarian-client-patient relationship" from being "established solely by telephonic

28  or electronic means."  *Id.* § 2032.1(e).  Thus, under the regulations enforced by Defendant, a

veterinarian may not "consult[ ]" with a prospective client about a veterinary patient's health through "electronic" means until the veterinarian has first established a relationship with the client and patient through an in-person meeting.  Not only that, but the relationship must be established anew with respect to each and every "medical condition" as it arises before a veterinarian may speak with the client about the patient's health.  *Id.* § 2032.1(b)(2).

61.     California's restriction on veterinary telehealth regulates speech.  Outside of their work, Plaintiff Veterinarians may communicate freely with others via telecommunication.  But when it comes to their professional work—"communicat[ing] advice derived from 'specialized knowledge,'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010)—Plaintiff Veterinarians face a limitation on their speech:  they may not engage in verbal "consultation" with a human client regarding the health of an animal patient except under restrictive conditions set forth by the State.  Cal. Code Regs. tit. 16, § 2032.1(f).   "An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be . . . disseminated." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)) (internal quotation marks omitted); *see also Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (explaining that licensing restrictions on "vocational training" regulate "speech protected by the First Amendment").  And Plaintiff pet owners have an equivalent First Amendment right to receive that information.  *Pac. Coast Horseshoeing Sch.*, 961 F.3d at 1069.

62.     California's restriction on veterinary speech is a *content-based* regulation of speech.  "[A] law is content-based if 'a regulation of speech on its face draws distinctions based on the message a speaker conveys.'" *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  California's regulations do just that:  Plaintiffs are free to speak with each other via Zoom about the weather, the San Francisco Giants, or any other topic of mutual interest.  But the conversation may not veer into "consultation" regarding the health of an animal without running afoul of California's prohibition.  Like the statute at issue in *Humanitarian Law Project*, Plaintiffs' speech is "not barred if it imparts only general or unspecialized knowledge." *Humanitarian Law Project*, 561 U.S. at 27.  And like

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
WASHINGTON, D.C.

1   that statute, California's regulation kicks in only if Plaintiff Veterinarians "communicat[e]

2   advice"—in this instance, on matters of veterinary health.   *Id.*   In other words, Plaintiff

3   Veterinarians "want to speak" to Plaintiff pet owners via telecommunications, "and whether they

4   may do so depends on what they say."   *Id*.   Such a rule "regulates speech on the basis of its

5   content."   *Id*.

6          63.     In the past, courts have upheld professional licensing restrictions like the

7   regulations at issue here on the theory that a "professional's speech is incidental to the conduct of

8   the profession.  If the government enacts generally applicable licensing provisions limiting the

9   class of persons who may practice the profession, it cannot be said to have enacted a limitation on

10  freedom of speech . . . subject to First Amendment scrutiny."   *Hines v. Alldredge*, 783 F.3d 197,

11  202 (5th Cir. 2015) (quoting *Lowe v. SEC*, 472 U.S. 181, 232 (1985) (White, J., concurring in the

12  result)).  That mode of analysis is no longer good law:  the Supreme Court has made clear that

13  states do not have "unfettered power to reduce a group's First Amendment rights by simply

14  imposing a licensing requirement" under the guise of professional regulations.   *Nat'l Inst. of Fam.*

15  *& Life Advocates v. Becerra*, 138 S. Ct. 2361, 2375 (2018).  It has therefore declined to draw

16  special constitutional rules for "content-based regulations of . . . professional speech."  *Id.* at 2374.

17  To the contrary, the Court recently reiterated that its "precedents have long protected the First

18  Amendment rights of professionals."   *Id.*  As the Court explained, "[p]rofessionals might have a

19  host of good-faith disagreements, both with each other and with the government, on many topics

20  in their respective fields," and "the people lose when the government is the one deciding which

21  ideas should prevail."   *Id.* at 2374-75.  And the Court has repeatedly expressed particular concern

22  for "the danger of content-based regulations 'in the fields of medicine and public health, where

23  information can save lives.'"  *Id.* at 2374 (quoting *Sorrell*, 564 U.S. at 566).

24         64.     In short, the Supreme Court has found no "persuasive reason for treating

25  professional speech as a unique category that is exempt from ordinary First Amendment

26  principles."   *Id.* at 2375.  As such, ordinary First Amendment principles govern California's

27  restrictions on veterinary telehealth.  And the governing First Amendment precedents are clear that

28

a "law that is content based" is "subject to strict scrutiny." *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2347 (quoting *Reed*, 576 U.S. at 165).

65.     California's veterinary telehealth restrictions cannot survive strict scrutiny.  Under strict scrutiny, Defendant has the burden of demonstrating that California's restriction on veterinary telehealth "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).  But California's requirement of an in-person examination as a precondition for veterinary speech fails to further any compelling governmental interest in the health and safety of animals—in fact, it hinders the communication of vital medical advice that would help animals—and it is far from narrowly tailored.  As described above, it applies to *all* veterinary specialties and situations, even those for which an initial in-person examination is wholly unnecessary or even dangerous.

66.     Indeed, California's veterinary telehealth restrictions do not satisfy even intermediate scrutiny because California cannot establish that they advance important governmental interests unrelated to the suppression of speech.  Unlike, for instance, commonplace regulations on prescribing certain medications, which primarily govern the legal entitlement to a controlled substance, California's restrictions target professional speech as speech.  The government has no legitimate interest in restricting truthful advice provided by veterinarians to willing clients.  In fact, many authorities like the AAVSB recognize the many advantages for veterinary healthcare of expanding remote communication between veterinarians and clients.

67.     California's veterinary telehealth restrictions also do not satisfy intermediate scrutiny because Defendant will be unable to establish that they do not burden substantially more speech than is necessary to further any important governmental interests.  There is no compelling state interest in categorically prohibiting the use of remote communications technology to establish a VCPR.

68.     California also favors certain speakers by permitting physicians who provide care to humans to speak in situations where veterinarians cannot, despite similar characteristics in the inability to communicate among the patient population and the required consent of the adults who

oversee them.   These irrational distinctions further undermine any purported rationale for restricting the use of remote technologies as a medium for speech.

69.   By enforcing and threatening to enforce the Board's prohibitions on Plaintiffs' use of remote communications and consultations, Defendant is inflicting ongoing and irreparable harm on veterinarians, clients, and their pets.

70.   Without declaratory and injunctive relief from this Court, that irreparable harm will continue indefinitely.

## SECOND CLAIM FOR RELIEF

### Fourteenth Amendment - Equal Protection

71.   The foregoing paragraphs are incorporated as though set forth fully herein.

72.   The Fourteenth Amendment guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

73.   The veterinarians managed by Dr. Scarlett and SF SPCA, the veterinarians managed by Dr. Rodi, and Dr. Kuzminski and the veterinarians she oversees, along with Drs. Berger, Gordon, and Van Horn, provide individualized veterinary advice consisting of ideas, opinions, and guidance that they communicate based on their extensive education in veterinary medicine, and their decades of professional experience.

74.   If Plaintiff Veterinarians were medical doctors who gave advice to human beings, they could do so through remote means without performing an in-person examination.   For purposes of this equal protection claim, Plaintiff Veterinarians are willing to comply with regulations that apply to similarly situated medical doctors, so long as those regulations do not abridge their freedom of speech or their clients' freedom of speech.

75.   The health and safety of humans is at least as important as the health and safety of other animals.  California does not have a heightened interest in prohibiting veterinary telehealth examinations.

76.   California's arbitrary and irrational treatment of veterinary communication with clients violates Plaintiffs' right to equal protection of the laws.  California cannot justify its veterinary speech restrictions on the grounds that animals cannot speak for themselves:  Neither

can infants or individuals with communicative impairments, but California does not restrict their parents', guardians', or medical doctors' ability to communicate through remote means about medical issues.  Nor is there any indication that differences in human and animal anatomy prevent veterinary clients from adequately communicating their animals' symptoms in many cases.  And California's prohibition on veterinary speech is not tied to any specific circumstance of veterinary practice that would narrow the speech restrictions experienced by veterinarians and their clients.  Instead, California categorically prohibits veterinary speech, even as it categorically permits medical speech regarding human patients.

77.     By enforcing and threatening to enforce the Board's prohibitions on Plaintiffs' use of remote communications and consultations, Defendant is inflicting ongoing and irreparable harm on veterinarians, clients, and their pets.

78.     Without declaratory and injunctive relief from this Court, that irreparable harm will continue indefinitely.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

A.     A declaration that Cal. Code Regs. tit. 16, § 2032.1 violates the First and Fourteenth Amendments to the U.S. Constitution to the extent that it prohibits Plaintiffs from using remote communications technology to speak about animal patients' health;

B.     Entry of a permanent injunction prohibiting Defendant from enforcing Cal. Code Regs. tit. 16, § 2032.1 to the extent that it prohibits Plaintiffs from using remote communications technology to speak about animal patients' health;

C.     Entry of judgment that the veterinarians managed by SF SPCA and Dr. Scarlett, the veterinarians managed by Dr. Rodi, Dr. Kuzminski and the veterinarians she oversees, and Drs. Berger, Gordon, and Van Horn may speak with clients and potential clients about their animals' health through remote technology;

D.     Entry of judgment that Kathleen Dillon, Jack Driscoll, and Sherri Franklin may speak with veterinarians about their pets through remote technologies, even when the pets under

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
WASHINGTON, D.C.

COMPLAINT

their care develop new medical conditions, or when they want to speak regarding any new pets who come under their care;

E.    An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

F.    An award of such other and further relief as the Court deems just and proper.

Dated:  May 3, 2021                    Respectfully submitted,

                                       By /s/ *Robert J. Ellison*

                                       LATHAM & WATKINS LLP
                                           Andrew D. Prins
                                           Robert J. Ellison
                                           Carolyn Homer
                                           Charles S. Dameron
                                           Soren J. Schmidt

                                           Attorneys for Plaintiffs

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiffs hereby demand a trial by jury on all issues so triable.

3  Dated:  May 3, 2021                                      LATHAM & WATKINS LLP

4                                                                          Andrew D. Prins
                                                                            Robert J. Ellison
5                                                                          Carolyn Homer
                                                                            Charles S. Dameron
6                                                                          Soren J. Schmidt

7

8                                                                  By   _/s/ Robert J. Ellison_____
                                                                            Attorney for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28